AMERICAN NAT. INS. CO. v. HICKS.
(No. 7800.)

(Court of Civil Appeals of Texas. Dallas. Oct. 27, 1917. Rehearing Denied Nov. 24, 1917.)

1. TRIAL ⚖══142—QUESTIONS FOR JURY.

The court is not authorized to take a question from the jury unless the evidence is of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.

2. INSURANCE ⚖══668(7) — ACTIONS — QUESTIONS FOR JURY—MISREPRESENTATIONS.

In an action on insurance policies issued on an application in which insured represented that he had not suffered any serious illness or disease prior thereto, evidence *held* to make a question for the jury as to whether an attack of renal colic, suffered a few months prior to the application, was a serious illness or disease, and hence a directed verdict was properly denied.

3. INSURANCE ⚖══151(2) — MEDICAL EXAMINER'S REPORT AS PART OF CONTRACT.

Under the statute (Vernon's Sayles' Ann. Civ. St. 1914, art. 4951) providing that every policy of insurance shall contain the entire

⚖══For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

contract between the parties, and that the application therefor may be made a part thereof, where the medical examiner's report to the insurance company was not mentioned or referred to in any way in the policies, and there was nothing in the report itself expressly or impliedly making it a part of the contract, it was not a part of the contract, and a statement therein that insured had never had renal colic, gravel, or calculus, if false, did not annul the policies, especially where the policies provided that the policy and application constituted the entire contract.

4. APPEAL AND ERROR ⚖➡1062(2)—HARMLESS ERROR—REFUSAL TO SUBMIT ISSUES.

Where, in an action on insurance policies, the jury found specially that insured had never had a serious illness or disease before the date of the policies, there was no error in refusing to submit a requested issue as to whether a misstatement in his application as to a former serious illness or disease, if made, was fraudulently made.

5. PLEADING ⚖➡129(2)—ADMISSIONS—NECESSITY OF PROOF.

In an action on insurance policies in which plaintiff sought to recover the statutory penalty for failure to pay and a reasonable attorney's fee, where the answer alleged as a defense false statements by insured, and did not allege that a demand for the payment of the policies had not been alleged or made, and at the trial defendant secured the right to open and conclude the argument by admitting that plaintiff had a good cause of action as set forth in her petition, except as it might be defeated by the facts of the answer constituting a good defense which might be established on the trial, the right to recover the penalty and attorney's fee was admitted, and judgment therefor was properly entered, though there was no allegation or proof of a demand.

6. TRIAL ⚖➡351(5)—SPECIAL ISSUES—QUESTIONS ALREADY SUBMITTED.

There was no error in refusing to submit special issues in the form in which they were requested, where they were substantially submitted in the court's charge.

7 APPEAL AND ERROR ⚖➡1064(1)—HARMLESS ERROR — INSTRUCTIONS — "SERIOUS ILLNESS OR DISEASE."

In an action on life insurance policies, an instruction defining "serious illness or disease" as one whose ailments and disorders were calculated to, or tended directly to, impair the general health or constitution of the person affected, or to produce death unless arrested, or to produce a vice in the constitution, and not including such slight temporary ailments as were calculated neither to affect nor threaten the general health or constitution of the person so affected, was not prejudicial as giving an incorrect or misleading definition, or as placing upon defendant a burden of proof greater than that imposed upon it by law, or as excluding from the jury's consideration proof introduced by defendant showing that insured had had an attack of renal colic, gravel, and calculus about three months prior to the application, and that he falsely and fraudulently represented that he had not had such illnesses or diseases.

[Ed. Note.—For other definitions, see Words and Phrases, Serious Disease; First and Second Series, Serious Illness.]

8. INSURANCE ⚖➡669(7) — MISREPRESENTATIONS—REPRESENTATIONS AS TO HEALTH.

Such definition was slightly, if at all, imperfect, and amply sufficient to guide the jury in determining whether insured had had any serious illness or disease prior to the date of the policies.

9. EVIDENCE ⚖➡477(2)—OPINION EVIDENCE—PHYSICAL CONDITION.

In an action on insurance policies defended on the ground that insured made false representations in the application, in that he had an attack of renal colic a few months prior to the application, where it appeared that insured's wife was absent from home when he was taken sick on the occasion in question, and it was not pretended that she was qualified as an expert, her testimony that he was in perfect health when she left home was inadmissible, as it was but her conclusion.

10. APPEAL AND ERROR ⚖➡1050(1) — HARMLESS ERROR—ADMISSION OF EVIDENCE.

The admission of such testimony was harmless, as the error was not one which was calculated to and did cause the rendition of an improper verdict and judgment.

Error from District Court, Dallas County; W. F. Whitehurst, Judge.

Action by Leona C. Hicks against the American National Insurance Company. Judgment for plaintiff, and the defendant brings error. Affirmed.

Thompson, Knight, Baker & Harris and Will C. Thompson, all of Dallas, for plaintiff in error. W. W. Hilbrant, of Dallas, for defendant in error.

TALBOT, J. The defendant in error, Leona C. Hicks, sued the plaintiff in error on two life insurance policies. The petition alleges "that on the 28th day of October, 1914, the defendant issued two policies on the life of William Thomas Hicks, each for $2,000, payable to the plaintiff; that the premium was paid for one full year, said policies being numbered 25621 and 25517; that William T. Hicks departed this life on October 5, 1915, and that the plaintiff has furnished due proof of the death of said W. T. Hicks to the defendant under each policy; that the defendant denied liability on November 5, 1915, and refused payment of said policies or any part of the same; that under article 4746 of the Revised Statutes plaintiff is entitled to recover 12 per cent. of damages on the full amount of the loss, together with a reasonable attorney's fee; that $500 is a reasonable attorney's fee; and that the defendant has failed and refused to pay either policy, so that the plaintiff is entitled to recover the sum of $6,000.

By its amended answer the defendant alleged that Mr. Hicks died less than one year from the date of the issuance of said policies; that by the terms of them the defendant was given the right to contest for any lawful cause within one year from date of issuance, and same stated that they and the applications therefor constituted the entire contract between the insured and the defendant; that defendant was induced to issue the policies sued on, and did issue the same, on account of a misrepresentation on the part of the assured, and, by reason of fraud and misrepresentation, it is not bound to pay any sum; that, to induce it to issue

such policies, the assured made an application in writing in order to show himself in an insurable physical condition, and submitted to a physical examination by defendant's examiner, and made written statements to the examiner in connection with his examination; that in the application and in the examination, and in the answers to the medical examiner, the said Hicks made false and fraudulent misrepresentations concerning his physical history and his physical condition, well knowing that such misrepresentations were false and fraudulent, for the purpose and with the intent of wrongfully inducing and procuring the defendant to issue the policies; that the defendant believed and relied upon the statements, and was thereby induced and did issue the policies sued on; that defendant learned of this fraud and misrepresentation about November 6th, and on that date, within a reasonable time after it discovered the falsity of the representation, it gave notice to the beneficiary of the policies that it refused to be bound thereby, which notice was within 90 days after discovering the falsity of the representations; that defendant tendered to the beneficiary all moneys paid to it as premiums on such policies; that the misrepresentations made to it are as follows: That in the application, which is a part of the contract, the insured stated and represented that he had had no serious illness or disease; and in the medical examination signed by him and presented to the defendant as a basis for the contract he stated, in answer to the question, "Have you ever been affected by any of the following named diseases or conditions, to wit, gallstone colic?" He answered "No." "Renal colic?" He answered, "No." "Gravel or calculus?" He answered, "No." And by such answers he represented to the defendant that he had never had any serious illness or disease, nor gallstone colic, nor renal colic, nor gravel, nor calculus; that each of such statements was false and was fraudulently made, and within less than six months prior to each of the policies sued on the assured had had a serious illness or disease, and had a pronounced attack of gallstone colic and renal colic, and had passed gravel or calculus, and had diseased kidney; and ·the defendant believes, and so alleges, that the assured had had other serious illnesses or diseases, and other attacks of maladies identical with or similar to those specifically described, the exact nature of which is to the defendant unknown; that the misrepresentations contained in the application and in the statement to the medical examiner were sent the defendant, and were believed and relied upon by it, and formed an inducement to it to enter into the contract of insurance sued on, and were part of the consideration therefor, and alleges further that such diseases were material to the risk of loss involved and upon the life of the insured; that such diseases rendered insured an uninsurable subject at the time the policies were applied for, and he would have continued to be uninsurable to the time of his death; that it believed and relied upon the representations, and would not have issued the policies, or either of them, had it known that such representations, or any of them, were not true; that said conditions, and each of them, weakened the physical stamina of the insured and directly contributed to his death; that the insured knew of such diseases and of his physical condition, and that in applying for and obtaining insurance without communicating the true facts to the defendant, and in misrepresenting such facts to the defendant, the insured committed a fraud upon it, and the plaintiff under such policies, because of such fraud, should not be permitted to recover of the defendant money not legally nor morally theirs; and defendant prayed judgment.

By supplemental petition the plaintiff, after a general demurrer and several special exceptions, alleged a general denial.

At the trial the defendant, under rule 31 (142 S. W. xx) of the district and county courts, took the opening and conclusion of the case.

The court defined a serious illness or disease as "one whose ailments and disorders are calculated to or tend directly to impair the general health or constitution of the person affected, or to produce death unless arrested, or to produce a vice in the constitution, and does not include such slight, temporary ailments as are calculated neither to affect nor threaten the general health or the constitution of the person so affected," and submitted to the jury for answer the following special issues:

No. 1. "Had the insured, William Thomas Hicks, previous to the 28th day of October, 1914, had any serious illness or disease, as hereinabove defined to you? Answer 'Yes' or 'No.'" To which the jury answered, "No."

No. 2. "Was the attack of renal colic· which William T. Hicks had in June, 1914, or the passing of the kidney stones at that time a serious illness or disease, as above defined to you? Answer 'Yes' or 'No.'" To which the jury answered, "No."

No. 3. "If you have answered the foregoing question No. 2 'Yes,' then state whether such misrepresentations was a misrepresentation of material facts or of a fact which affected the risk assumed by the insurance company in writing the policies sued on?" This question the jury did not answer, since they had previously answered that the said Hicks had not had any serious illness or disease before the date of the policies.

Upon such finding the court rendered judgment in favor of the plaintiff and against the defendant for the sum of $5,090.67, with interest thereon from date of judgment at the rate of 6 per cent. per annum, such judgment being $4,000 principal, $480 for 12 per cent. damage, and $500 for attorney's fees, the balance being 6 per cent. interest on $4,000 from November 6, 1915, to the date of the judgment. The defendant filed a motion for a new trial, which was overruled, and the defendant excepted thereto. Defend-

ant filed its application for writ of error, and seeks in this court a reversal of the judgment against it.

[1, 2] The first assignment of error is to the effect that the trial court erred in refusing to give to the jury, at the conclusion of the evidence, a special charge requested by the plaintiff in error directing the jury to return a verdict in its favor. It is urged. that this charge should have been given, because the "undisputed evidence shows that the policies of life insurance sued on were issued as a result of a material misrepresentation on the part of the assured," in that in making application for the insurance he represented that he had not suffered any serious illness or disease prior thereto, whereas he had in fact, about three months prior to such application and the issuance of said policies, had an illness or disease known as renal colic, and had gravel and calculus in one or both kidneys and the canals leading therefrom, which illnesses and diseases were serious, and were material to and substantially affected the risk assumed by the insurance company in writing the insurance policies. Our conclusion is that the assignment must be overruled. In his application for the policies issued to him the assured, W. T. Hicks, stated that he had not, prior thereto, had any serious illness or disease except diseases incident to childhood, and the undisputed evidence shows that about four months before the making of said application the assured suffered an attack of renal colic; but we are not prepared to agree with the contention of appellant and say that the undisputed evidence established that the attack of renal colic suffered by the assured was, within the meaning of the language used in the application and as understood by the assured and the insurance company, a serious illness or disease. , That such was its character as shown by much of the testimony cannot successfully be denied; but that the jury, from a consideration of all the evidence, was justified in finding as they did find, that the attack of renal colic suffered by the assured a few months before he secured the issuance of the policies in question was not in fact a serious illness or disease, must, we believe, be admitted. The rule which has so often been announced by the decisions of this state is that the court is not authorized to take the question from the jury unless the evidence is of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. Dr. R. B. McBride, representing the insurance company, examined the assured in October, immediately before the policies sued on were issued, and testified on the trial of this case. Among other things, he said:

"Renal colic defined, I guess, would be a pain originating in the urinary tract. It is a pain in the urinary tract. The urinary tract begins with the kidney under tube that leads from the kidney to the bladder. The tract includes the kidney itself and on down from the kidney to the bladder. Renal colic is a pain originating in that tract." "If I were called to treat a man, having been called upon at some hour in the morning, anywhere from 9 to 12, and found him suffering with pain extending in the region of his kidneys and around in front, and if I diagnosed the case as renal colic, and prescribed diuretic at that time for the purpose of flushing the kidneys, and I returned the next day and found him well—not suffering from the effects of it in any way—I would consider it a serious proposition. He might be feeling well the next day and might not be a well man to me. If he had a stone, the infected kidney had caused it. That caused the pain the day before. It would not make any difference how easy he was the next day, I would consider it a serious proposition. I would not have recommended to the American National Insurance Company as being an insurable risk a man who within three to six months before the date of this examination had had a case of renal colic."

On. cross-examination he said:

"I found no irregularity in the urine of the assured. I made the examination of him, October 28, 1914, and found the urine chemically normal. I also examined the lungs and his heart, and measured him and took his temperature and counted his pulse. He was a man of apparently normal physique. He was a fine physical speciman of manhood. I think from these measurements that he must have been one of the finest physical specimens of manhood I ever saw or ever examined for life insurance. I used the stethoscope to examine his lungs. I found nothing wrong with his lungs. I found nothing wrong with his heart. * * * I did not find any physical defects in the man at the time I made this examination, on the 28th day of October, 1914. The object of the physical examination to which a man who is applying for insurance is subjected is to determine whether he is sound physically. * * * In our office we have the most improved forms of instruments that are known and generally used for the purpose of ascertaining the true health of a man, When I first made this examination of Mr. Hicks I did not find any signs of any character or kind of disease that had existed in his kidneys. If there had been pus or kidney stones in his kidneys, the examination made would not necessarily have disclosed the fact."

This witness further testified:

"If about the middle of June, 1914, a man is suffering with a slight attack of renal colic, in which he passes some 5 or 6 small stones about the size of a pin head or a little bit larger, and he is not confined to his bed, and is able to go to his work, and does go to work the Monday following, and thereafter feels no physical pain as the result of said illness, and I am then called upon to make a physical examination of him about the 28th day of October after that, and I make a thorough examination of him, and in that examination I am not able to disclose that there is any physical deformity or defect or any disease or any defect of the kidneys from urinal examination or otherwise, I think the chances are good that that man was at that time in good physical condition and had not suffered with a serious illness."

The testimony of the witness just quoted was given, it seems, in answer to a hypothetical question based upon evidence authorizing it. Dr. Trumbull testified, after stating that the assured, Hicks, died in October, 1915, as follows:

"I had occasion to treat him as a physician prior to his death. I was first called to see him some time in January, 1914 (evidently June, 1914). I saw him at his residence. He was in bed at that time. That was the first

time I had ever been called to see him. I made an examination of him at that time and found that he had renal colic; that is, he was suffering with an attack of kidney stones and trying to pass kidney stones. That is about all I know to explain it. He was suffering from extreme pain, radiating from the back down through the hip, down to the scrotum and testicles. I gave him some morphine diuretic. That is a drug to flush the kidneys. As a result of that treatment he improved. I think that was on Saturday, as well as I remember, and I saw him again Sunday, and everything was all right. That was Saturday morning. He passed kidney stones at that time. At that time he had some stones there that he told me afterwards he had passed. I told him what they were when he showed them to me. At that time I did not give him any advice regarding an operation, but I advised him if he ever had any more trouble of that kind to have an X-ray picture made. Those stones that he passed, I think, were so small that they would not have been shown by an X-ray picture. Only about 20 per cent. of X-ray pictures are positive, because the stones are passed by the X-ray, and do not throw any shadow, and that would be of no avail; but I told him if he had any more trouble of that kind to have an X-ray picture made. Then we afterwards got the X-ray during his final illness. As I remember, it was on Sunday morning that I went to see him, and then I probably saw him, I think, again the following night, and the next morning I remember, making two days that I saw him. I did not see him professionally any more during the month of June. I was in the house and would inquire as to how he was feeling. I would go to the house to see some one else professionally. He was confined to his bed about two days or a day. I do not know how long, and I do not remember how long he had been suffering when I first saw him. I did not attach any importance to it at the time, and I did not try to remember; but as I remember he was in bed about 24 or 48 hours, not over 48 hours the whole time. After that I was not called to see him again until June, 1915, and he was in bed at that time. In 1914, when I first saw him, there was no other doctor with me in the case. In June, 1915, when I first saw him, there was no other doctor with me. In June, 1915, when I went to see him, I found that he had the same trouble. He passed some kidney stones in June, 1915. I think they were about the same size as the others. He was experiencing pain in June, 1915. At that time he was in bed three or four days. We did not have an X-ray picture made of him at that time. I suggested one. I think I saw him at that time four times—no, about three times—as well as I remember. After June, 1915, I treated him later in June for appendicitis. There was no other doctor in the case with me then for about 48 hours. Then Dr. Thomason came. As well as I remember, about a week, probably eight or nine days, elapsed between the first time I saw him in 1915 and the last time. He had gotten up between those times and was at his work. When I was called to see him the second time in June, 1915, his pain was over his appendix. I diagnosed his case and concluded that it was appendicitis. He had a very bad appendix. I saw him one night about 11 or 12 o'clock. I tried to get him to the hospital, but he did not want to go. Then I saw him the next morning and the next evening, and then I saw him the next morning and told him that if he was not better by noon he would have to go to the hospital. At noon he was no better and I told him he would have to do one thing or the other—go to the hospital or get another doctor. When I say, 'Go to the hospital' I wanted him to be onerated on, and so he asked that I call Dr. Thomason, and he agreed with me; and after talking around about an hour or so we got him to go to the hospital, and we operated on him and found a very bad, ruptured, gangrenous appendix. In June, 1914, stones that he had passed were very small, about the size of a pinhead or a little bit larger. I believe there was one of them about the size of a very small pea. It was a little bit larger than the rest of them. There were five or six about the size of a pinhead. In June, 1915, they were about the same size, quite a few the size of a pinhead and there were several others as large as the largest he had passed before. I did not see any kidney stones pass from him. All that I know is what he told me about the stones having passed. I think that I waited on him for a second attack of renal colic about the 10th of June, and it lasted three or four days. He was in bed most of the time during that period, a greater part of the time. I was successful in giving him relief and curing him from that attack, and he recovered and went to his work again. I do not think that the case of renal colic which I had treated him for in June, 1914, contributed or added to or caused his death."

Dr. Grigsby, introduced by the defendant in error, who was treating the assured, Hicks, at the time of his death, testified that Mr. Hicks had evidence of sepsis or blood poisoning, and that in his opinion the death of Mr. Hicks was caused by multiple abscesses of the liver following appendicitis; that poisons don't generate in the kidneys; that they generate in the blood, and are not thrown out through a diseased kidney. He further said:

"If there are stones in the kidneys and the urinary canal which are pronounced enough to cause an attack of renal colic, and after considerable pain some of these stones pass out, I don't think those stones set up inflammation enough in the kidney and the urinary tract together for the poisons to get into the blood and be carried to other parts of the body, unless the stones were there in the kidney, and they would show evidence of being there by pus and blood in the urine. A stone in this cheesy looking substance constituting the kidney may set up irritation like a piece of hard substance in the eye might set up irritation in the eye, although it is known that very large stones have been found in the kidneys that did not cause irritation. But stones do cause trouble."

Dr. Howell testified in part:

"I am not a practicing physician. I am medical director for the Southwestern Life Insurance Company. If a man had one attack of renal colic and passes 5 kidney stones the size of a pinhead, and one about the size of a small pea, in the early part of June, 1914, and then in the early part of June, 1915, he had another attack of renal colic, and passes kidney stones of the same size and number and some of a little larger size, or the same size, the man would necessarily have an attack of excruciating pain in passing the stones. This would not have any effect upon his system generally as to the resistance of disease. Individuals may appear perfectly healthy and normal and just have these attacks intermittently."

Dr. Thomason testified, among other things, as follows:

"I am engaged in the practice of medicine and surgery. The style of my firm is Drs. Samuels, Thomason, Hill, Roelke & Trumbull. I was acquainted with W. T. Hicks during his lifetime. I was called upon to treat him professionally in June, 1915. I made a diagnosis of his case at that time. I found him suffering with a bad form of appendicitis. I advised an immediate operation. That was along about 12 o'clock, I judge, and along between 2:30 and 3

I operated on him. I performed the operation. On examination before the operation, you could feel a decided mass, pretty badly swollen and pretty tender. After cutting down and getting down inside of the abdominal cavity, through the peritoneum, there was a pretty considerable lot of free fluid pus coming out of him when I opened up the peritoneum. Then the appendix was a whole mass of adhesions. We separated this mass from the appendix. The pus, quite a bit of pus, came out. The appendix was very black and rotten and was bursted and the odor was distinct. I followed the treatment of Mr. Hicks for a couple of weeks. He was in the hospital. He left the hospital at about the end of two weeks. I think his death was due to a ruptured, gangrenous appendix. He was thoroughly septic at the time of his death, but I think that resulted from the appendix. A man who was suffering with an attack of renal colic which would come to him some time during the forenoon, and he is attended by a physician who gives him the general treatment for the relief of renal colic, and during the day he passes 4 or 5 or 6 small kidney stones the size of a pinhead and one the size of a small pea, and who is seen again by the physician probably during the same evening, later in the evening, and is found not suffering seriously, and is again attended by the physician on the following Sunday morning, and found not to be suffering from any of the ill effects of the recent attack, and he goes about his work on Monday without any ill effects from the recent attack, and keeps at his work for a period of four months or more without any recurring attack of renal colic, and without any attack of any disease of any character or description whatsoever intervening between that sickness and the 28th day of October, in my opinion as to whether the man was suffering from a serious illness or disease at the time he was treated, I would not think that would be a serious condition."

We have not attempted to state the testimony in full. It is conflicting in important particulars, but sufficient, as that portion quoted shows, to sustain the findings of the jury and the judgment of the court based thereon. It does not, as we believe, in legal contemplation, fall short of any evidence tending to show, in answer to the defense set up by the plaintiff in error, that the assured, Hicks, had not had any serious illness or disease prior to making application for and securing the policies sued on. On the contrary, there is substantial evidence, we think, to sustain the finding of the jury that the attack of renal colic which the assured had or the passing of kidney stones, in June, 1914, prior to the making of his application for the insurance, was not at that time a serious illness or disease. The testimony very clearly shows that the assured died from the effects of appendicitis, and that the renal colic with which he suffered contributed nothing thereto.

[3] The medical examiner's report to the insurance company cannot, in our opinion, be considered as a part of the insurance contract entered into between the company and the assured, Hicks. It is not mentioned or referred to in any way in the policies, nor do we find anything in the report itself either expressly or impliedly making it a part of said contract. The written application of the assured, however, is by the express terms of the policies made a part of the contract and is attached to the same. Our statute provides that every policy of insurance issued or delivered within this state on or after the 1st day of January, 1910, by any life insurance company doing business within this state, shall contain the entire contract between the parties, and the application therefor may be made a part thereof. Besides, the policies issued to the assured, Hicks, contain a provision that the policy and application therefor shall constitute the entire contract between the parties. The medical examiner's report showing that the assured therein stated that he had never had renal colic, gravel, or calculus is an instrument entirely separate from the policies and the application therefor, and is not, by reference or otherwise, made a part of either, and under our statute cannot, it would seem, constitute any part of the contract of insurance. Therefore the statement in said report that the assured had never had renal colic, gravel, or calculus, if false, cannot be invoked to annul the policies. Each of the policies declare that it is to be incontestable after one year from the date of its issuance, and it may be conceded that article 4951, Vernon's Sayles' Civil Statutes, "providing that the falsity of statements made in the application for insurance shall constitute no defense to a suit to recover upon the policy, unless the misrepresentation was in relation to a matter material to the risk or contributing to the contingency or event rendering the policy due and payable, has therefore no application." Blackstone v. Ins. Co., 107 Tex. 102, 174 S. W. 821. But, as in Blackstone's Case, the case here turns upon the question whether the statement of the assured in his application for the insurance policy sued on, to the effect that he had never had any serious illness or disease prior to the making of said application, is to be regarded as untrue; and the evidence being sufficient, as we have held, to take that question to the jury as an issue of fact for their determination, it was settled by their verdict in favor of the defendant in error. It cannot, in our opinion, be correctly held, under the evidence before us, as a matter of law, that the attack of renal colic suffered by the assured, Hicks, about four months prior to the issuance of the policies in suit, was "a serious illness or disease." As before said, whether it was or was not such a disease or illness became under the evidence an issue of fact.

[4] The second assignment of error will also be overruled. The jury having found that the assured had never had a serious illness or disease before the date of the policies in question, there was no error in refusing to submit the issue requested by the plaintiff in error to the effect that if they should find that the assured made a misstatement in his application as to a former serious illness or disease, then answer whether or not such misstatement was fraudulently made.

[5] The third assignment of error contained in plaintiff in error's brief is, in substance, that the trial court erred in entering judgment for the defendant in error for the penalty of 12 per cent. and the attorney's fee of $500. The contention is that this was error because there was neither pleading nor evidence upon which to base such judgment. No such question was raised in the trial court, and it is presented here as fundamental error. Whether it should be regarded as such error may be seriously doubted, but since the plaintiff in error secured and exercised, under rule 31, the right to open and conclude the argument of the case before the jury by admitting that defendant in error, plaintiff below, had a good cause of action as set forth in her petition, except so far as it might be defeated in whole or in part by the facts of the answer constituting a good defense, which might be established on the trial, and since the facts alleged in the answer of the plaintiff in error to defeat the cause of action set forth in the petition of the defendant in error were that the policies sued on had been obtained by the assured by reason of a false statement that he had never had a serious illness or disease before the date of the policies sued on and in no way charged that a demand for the payment of said policies had not been alleged or made, the right to recover the penalty and attorney's fee was admitted and judgment therefor was properly entered.

The record fails to show that the Emerson-Brantingham Implement Company had any such interest in policy No. 25517, sued on, as made it a necessary party to the suit, and the court correctly rendered judgment in favor of the defendant in error for the full amount of both policies, and the penalty, interest, and attorney's fees.

The fifth assignment of error is to the effect that the court erred in refusing to submit to the jury the following issue requested by the plaintiff in error:

"Was the misstatement made by Wm. T. Hicks in the medical examiner's report signed by him, to the effect that he had never had renal colic, gravel, or calculus, a misrepresentation of a material fact or of a fact which affected the risk assumed by the insurance company in issuing the policy sued on?"

The medical examiner's report, as we have held, formed no part of the contract of insurance entered into between the insurance company and the assured, Hicks, and any false statement Mr. Hicks may have made therein to the medical examiner of the insurance company would not, under our law, as we understand it, be ground for avoiding the policies. The requested issue was therefore properly refused.

[6] The special issues requested and refused by the court, the refusal of which is made the basis of the sixth assignment of error, were substantially as presented by the plaintiff in error submitted in the court's charge to the jury, and hence the refusal to submit them in the form requested was not error.

[7, 8] As shown in a former part of this opinion, the court charged the jury as follows:

"A serious illness or disease is one whose ailments and disorders are calculated to, or tend directly to, impair the general health or constitution of the person affected, or to produce death unless arrested, or to produce a vice in the constitution, and does not include such slight temporary ailments as are calculated neither to affect nor threaten the general health or constitution of the person so affected."

This portion of the court's charge is assigned as error, and the proposition asserted is as follows:

"In a suit upon a life insurance policy, where the defenses of fraud and misrepresentation are supported by evidence that the assured in his application stated that he had not had a serious illness or disease or had renal colic, or gravel, or calculus, when in fact he had an attack of renal colic a short time before his application was made, and another attack shortly after his application was made, and died, it is reversible error for the trial court to incorrectly define 'serious illness or disease.'"

The assignment of error refers to the bill of exceptions reserved to the charge for a statement of the reasons why it is erroneous. Looking to that bill, we find that the charge was excepted to (1) because it is an incorrect, misleading, and a prejudicial definition of the terms "serious," "illness," or "disease"; (2) because it had the effect of placing upon the defendant a burden of proof greater than that imposed upon it by law; (3) because the charge operated to exclude from the consideration of the jury the proof introduced by defendant showing that Wm. T. Hicks had had an attack of renal colic, gravel, and calculus about three months prior to making application for the policies of insurance sued on, and that he falsely and fraudulently represented to the defendant insurance company that he had not had such illnesses or diseases. Neither the assignment of error, the proposition thereunder, nor the objections to the charge undertake to point out specifically wherein or in what particular the definition of the term "serious illness or disease," is incorrect. And the most the objections urged to the charge in the bill of exceptions do is to point out its effect upon the matters referred to in said objections. Answering these objections to the charge it is sufficient to say, we think, that it did not have the effect to prejudice the rights of the plaintiff in error in either particular claimed. But we think the charge is substantially correct. In May on Insurance, vol. 1, § 296, it is said:

"A serious illness must be one which permanently impairs the constitution and renders the risk more hazardous."

Likewise, in Bacon on Life and Accident Insurance, § 289, it is said:

"Before any temporary ailment can be called a disease, it must be such as to indicate a vice in the constitution, or be so serious as to have

some bearing upon general health and the continuance of life, or such as, according to common understanding, would be called a disease. A severe sickness or disease does not include the ordinary diseases of the country, which yield readily to medical treatment, and, ended, leave no permanent injury to the physical system, but refers to those severe attacks which often leave a permanent injury and tend to shorten life. Clearly the term severe or serious illness does not mean slight temporary physical disturbances or ailments, speedily and entirely recovered from, not interfering materially with the pursuit of one's avocation."

Thus very clearly and accurately has the term "serious illness" been defined, and, tested by such definition, the charge of the court under consideration is very slightly, if at all, imperfect, and amply sufficient, as was its purpose, to guide the jury in determining, under the evidence submitted, whether or not the assured, Hicks, had had any serious illness or disease prior to the date of the policies of insurance sued on.

[9, 10] The defendant in error, Mrs. Leona Hicks, testified that at the time the assured, her husband, took sick, in June, 1914, she was not at Dallas with him; · that she had gone home on account of her mother's death. She was then permitted to say, over the objection of the plaintiff in error, that when she left Dallas the assured was in perfect health. The admission of this testimony is complained of, and we think the complaint well founded. The statement allowed was but the conclusion of the witness, and there is no pretense that she was qualified to speak as an expert. We are of the opinion, however, that it cannot reasonably and fairly be said that this error was calculated to and did cause the rendition of an improper verdict and judgment. On the contrary, we think it should be regarded as harmless, and that the assignment of error presenting it should be overruled.

There are several assignments of error that have not been mentioned and discussed. These assignments have been duly considered. The questions raised by some of them have been disposed of by us adversely to the contention of the plaintiff in error, and those not so disposed of disclose no reversible error.

Believing the judgment should be affirmed, it is so ordered.

Affirmed.